Steven R. Wirth, Esq.
Peter O. Larsen, Esq. (*pro hac vice* admission pending)
Raye C. Elliott, Esq. (*pro hac vice* admission pending)
AKERMAN LLP
401 East Jackson Street, Suite 1700
Tampa, Florida 33602
Telephone: (813) 223-7333
E-mail: steven.wirth@akerman.com
          raye.elliott@akerman.com

*Attorneys for Appellant, Michael Goldberg,*
*Plan Administrator*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Bankr. Case No. 23-13359 (VFP) |
| 20230930-DK-BUTTERFLY-1, INC. F/K/A/ BED BATH & BEYOND, INC., *et al.,* | Adv. Pro. No. 24-01443 (VFP) |
| Debtors. | |
| | Case No. 2:25-cv-06676 (BRM) |
| MICHAEL GOLDBERG, AS PLAN ADMINISTRATOR FOR 20230930-DK-BUTTERFLY-1, INC. f/k/a Bed Bath & Beyond, Inc., *et .al.*, | **INITIAL BRIEF OF APPELLANT** |
| Plaintiff/Appellant, | |
| v. | |
| NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY, | |
| Defendant/Appellee. | |

82337830;1

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8012(b)(1), Federal Rules of Bankruptcy Procedure, Appellant, Michael Goldberg as Plan Administrator of 20230930-DK-Butterfly-1, Inc. identifies each Debtor not named in the caption as follows:

Bed Bath & Beyond, Inc.
Alamo Bed Bath & Beyond Inc.
BBB Canada LP Inc.
BBB Value Services Inc.
BBBY Management Corporation
BBBYCF LLC
BBBYTF LLC
bed 'n bath Stores Inc.
Bed Bath & Beyond of Annapolis, Inc.
Bed Bath & Beyond of Arundel Inc.
Bed Bath & Beyond of Baton Rouge Inc.
Bed Bath & Beyond of Birmingham Inc.
Bed Bath & Beyond of Bridgewater Inc.
Bed Bath & Beyond of California Limited Liability Company
Bed Bath & Beyond of Davenport Inc.
Bed Bath & Beyond of East Hanover Inc.
Bed Bath & Beyond of Edgewater Inc.
Bed Bath & Beyond of Falls Church, Inc.
Bed Bath & Beyond of Fashion Center, Inc.
Bed Bath & Beyond of Frederick, Inc.
Bed Bath & Beyond of Gaithersburg Inc.
Bed Bath & Beyond of Gallery Place L.L.C.
Bed Bath & Beyond of Knoxville Inc.
Bed Bath & Beyond of Lexington Inc.
Bed Bath & Beyond of Lincoln Park Inc.
Bed Bath & Beyond of Louisville Inc.
Bed Bath & Beyond of Mandeville Inc.
Bed, Bath & Beyond of Manhattan, Inc.
Bed Bath & Beyond of Opry Inc.
Bed Bath & Beyond of Overland Park Inc.
Bed Bath & Beyond of Palm Desert Inc.
Bed Bath & Beyond of Paradise Valley Inc.

Bed Bath & Beyond of Pittsford Inc.
Bed Bath & Beyond of Portland Inc.
Bed Bath & Beyond of Rockford Inc.
Bed Bath & Beyond of Towson Inc.
Bed Bath & Beyond of Virginia Beach Inc.
Bed Bath & Beyond of Waldorf Inc.
Bed Bath & Beyond of Woodbridge Inc.
Buy Buy Baby of Rockville, Inc.
Buy Buy Baby of Totowa, Inc.
Buy Buy Baby, Inc.
BWAO LLC
Chef C Holdings LLC
Decorist, LLC
Deerbrook Bed Bath & Beyond Inc.
Harmon of Brentwood, Inc.
Harmon of Brentwood, Inc.
Harmon of Caldwell, Inc.
Harmon of Carlstadt, Inc.
Harmon of Franklin, Inc.
Harmon of Greenbrook II, Inc.
Harmon of Hackensack, Inc.
Harmon of Hanover, Inc.
Harmon of Hartsdale, Inc.
Harmon of Manalapan, Inc.
Harmon of Massapequa, Inc.
Harmon of Melville, Inc.
Harmon of New Rochelle, Inc.
Harmon of Newton, Inc.
Harmon of Old Bridge, Inc.
Harmon of Plainview, Inc.
Harmon of Raritan, Inc.
Harmon of Rockaway, Inc.
Harmon of Shrewsbury, Inc.
Harmon of Totowa, Inc.
Harmon of Wayne, Inc.
Harmon of Westfield, Inc.
Harmon of Yonkers, Inc.
Harmon Stores, Inc.
Liberty Procurement Co. Inc.
Of a Kind, Inc.

One Kings Lane LLC
San Antonio Bed Bath & Beyond Inc.
Springfield Buy Buy Baby, Inc.

Pursuant to Rule 8012(b)(2), Appellant states that there is no corporation that

is a parent corporation or that owns 10% or more of the stock of any of the above

named Debtors.

82337830;1

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF THE ISSUE PRESENTED AND STANDARD OF
    REVIEW ..........................................................................................................1

INTRODUCTION ...............................................................................................3

STATEMENT OF THE CASE.................................................................................5

    A.    Bankruptcy Case Background..................................................................5

    B.    Factual Background................................................................................6

    C.    Procedural Background .........................................................................13

SUMMARY OF THE ARGUMENT .......................................................................15

ARGUMENT ....................................................................................................16

    I.    The Bankruptcy Court Committed Reversible Error By
        Denying the Motion for Leave to File Amended Complaint
        Because Leave to File an Amended Complaint Must Be Freely
        Given ...................................................................................................16

    II.    The Bankruptcy Court Erred In Holding That The New Jersey
        Contractual Liability Act Applied To The Agreements.....................17

    III.    Alternatively, the Bankruptcy Court Committed Reversible
        Error in Holding that the Plan Administrator Did Not
        Substantially Comply With the New Jersey Contractual
        Liability Act .......................................................................................22

    IV.    The Bankruptcy Court Erroneously Held That Filing The
        Amended Complaint Would Be Futile................................................30

        A.    The NJEDA Cannot Use The BEIP Debtors' Default
            Under the Agreements In 2021 To Excuse Its Prior
            Breach of the Agreements That Began in 2011.......................31

      B.    NJEDA Cannot Terminate the Agreements Because It
            Did Not Provide Notice to the BEIP Debtors ...........................40

CONCLUSION ......................................................................................................45

82337830;1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adler v. Gruma Corp.*,
  135 F.4th 55 (3d Cir. 2025) ................................................................................2

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ................................31

*C.L. v. Div. of Med. Assistance & Health Servs.*,
  473 N.J. Super. 591, 284 A.3d 860 (App. Div. 2022)..................................20, 42

*CBA Env't Servs., Inc. v. Toll Bros. Inc.*,
  403 F. Supp. 3d 403 (D.N.J. 2019).....................................................................30

*City of Trenton v. Cannon Cochran Mgmt. Servs., Inc.*,
  No. A-5576-09T1, 2011 WL 3241579 (N.J. Super. Ct. App. Div.
  Aug. 1, 2011) .................................................................................................31, 36

*Cnty. of Hudson v. State, Dep't of Corr.*,
  208 N.J. 1, 26 A.3d 363 (2011) ..........................................................................24

*Cnty. of Hudson v. State, Dep't of Corr.*,
  No. A-3511-05T2, 2007 WL 1836883 (N.J. Super. Ct. App. Div.
  June 28, 2007)......................................................................................................23

*Cnty. of Morris v. Fauver*,
  153 N.J. 80, 707 A.2d 958 (1998) ......................................................................23

*Connelly v. Lane Const. Corp.*,
  809 F.3d 780 (3d Cir. 2016) ...............................................................................31

*Craddock Int'l Inc. v. W.K.P. Wilson & Son, Inc.*,
  116 F.3d 1095 (5th Cir. 1997) ............................................................................19

*D.R. by M.R. v. E. Brunswick Bd. of Educ.*,
  838 F. Supp. 184 (D.N.J. 1993)..........................................................................41

*Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.*,
  373 F.3d 1100 (10th Cir. 2004) ..........................................................................19

*Dixon v. JPay, Inc.*,
   No. A-4498-19, 2022 WL 1510747 (N.J. Super. Ct. App. Div. May
   13, 2022) .............................................................................................................22

*Eddy v. Virgin Islands Water & Power Auth.*,
   256 F.3d 204 (3d Cir. 2001) ...............................................................................16

*Eze v. Rowan Univ.*,
   No. A-2659-07T2, 2009 WL 232181 (N.J. Super. Ct. App. Div.
   Feb. 3, 2009) ................................................................................................24, 25

*Foman v. Davis*,
   371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) .........................................16

*Frapaul Const. Co. v. State, Dep't of Transp.*,
   175 N.J. Super. 84, 417 A.2d 592 (App. Div. 1980)...........................................22

*Frederico v. Home Depot*,
   507 F.3d 188 (3d Cir. 2007) ...............................................................................38

*Galik v. Clara Maass Med. Ctr.*,
   167 N.J. 341, 771 A.2d 1141 (2001) ..................................................................24

*Harrington v. Dir., Div. of Tax'n*,
   No. 009529-2011, 2015 WL 1084865 (N.J. Tax Ct. Mar. 2, 2015)...................23

*Holtec Int'l v. New Jersey Econ. Dev. Auth.*,
   No. A-1477-21, 2023 WL 8264184 (N.J. Super. Ct. App. Div.
   Nov. 30, 2023) ....................................................................................................44

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) .............................................................................30

*In re Catanzareti*,
   400 B.R. 145 (Bankr. D.N.J. 2009), *aff'd*, No. CIV.A.09-
   2666GEB, 2009 WL 3424176 (D.N.J. Oct. 20, 2009) .......................................41

*JPC Merger Sub LLC v. Tricon Enterprises, Inc.*,
   474 N.J. Super. 145, 286 A.3d 1186 (App. Div. 2022).......................................20

*Kaufman v. Provident Life & Cas. Ins. Co.*,
   828 F. Supp. 275 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993)................44

*Kollar v. Miller*,
  176 F.3d 175 (3d Cir. 1999) .................................................................................2

*Lake v. Arnold*,
  232 F.3d 360 (3d Cir. 2000) .................................................................................1

*Lameiro v. West New York Bd. of Educ.*,
  136 N.J. Sup. 585, 588, 347 A.2d 377 (Law Div. 1975)....................................25

*Lebron v. Sanchez*,
  407 *N.J.Super.* 204, 970 *A.*2d 399 (App. Div. 2009) .........................................24

*M.J. Paquet, Inc. v. N.J. Dep't of Transp.*,
  171 N.J. 378 (2002) ............................................................................................44

*Matter of Est. of Jones*,
  477 N.J. Super. 203, 305 A.3d 525 (App. Div. 2023)........................................41

*Michael J. Wright Const. Co. v. Kara Homes, Inc.*,
  396 B.R. 131 (D.N.J. 2008) ..................................................................................2

*Mid-American Salt, LLC v. Morris County Cooperative Pricing Council*,
  964 F.3d 218 (3d Cir. 2020) .................................................................................1

*Nester v. O'Donnell*,
  301 N.J. Super. 198 (App. Div. 1997).................................................................44

*Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C. v. Lowenstein Sandler, P.C.*,
  365 N.J. Super. 241, 839 A.2d 52 (App. Div. 2003).........................................20

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
  968 F.2d 371 (3d Cir. 1992) ...............................................................................37

*Schor v. FMS Fin. Corp.*,
  357 N.J. Super. 185 (App. Div. 2002).................................................................44

*Shane v. Fauver*,
  213 F.3d 113 (3d Cir. 2000) ...............................................................................30

*Silverstein v. Keane*,
  19 N.J. 1, 115 A.2d 1 (1955) ..............................................................................20

*Sköld v. Galderma Lab'ys L.P.*,
   917 F.3d 186 (3d Cir. 2019) .................................................................................2

*Sons of Thunder, Inc. v. Borden, Inc.*,
   285 N.J. Super. 27, 666 A.2d 549 (1995), *rev'd on other grounds*,
   148 N.J. 396, 690 A.2d 575 (1997) ....................................................................41

*Strategic Dev. Grp., LLC v. New Jersey City Univ.*,
   No. A-1576-23, 2024 WL 3169850 (N.J. Super. Ct. App. Div. June
   26, 2024) ............................................................................................................26

*Vegas United Inv. Series 105, Inc. v. Celtic Bank Corp.*,
   135 Nev. 456, 453 P.3d 1229 (Nev. 2019) .........................................................19

*W.V. Pangborne & Co. v. New Jersey Dep't of Transp.*,
   116 N.J. 543, 562 A.2d 222 (1989) ...............................................................23, 44

*Weisman v. New Jersey Dep't of Hum. Servs.*,
   982 F. Supp. 2d 386 (D.N.J. 2013), *aff'd*, 593 F. App'x 147 (3d Cir.
   2014) ...................................................................................................................37

*Zamel v. Port of New York Auth.*,
   56 N.J. 1, 264 A.2d 201 (1970) ..........................................................................26

**Statutes**

28 U.S.C. § 158(a) ......................................................................................................1

28 U.S.C. § 1334(a) ....................................................................................................1

Bankruptcy Code § 1107(a) ........................................................................................5

Bankruptcy Code § 1108 .............................................................................................5

N.J.S.A. § 34:1B-5 ....................................................................................................18

N.J.S.A. § 34:1B-124, *et. seq*..............................................................................8, 33

N.J.S.A. § 34:1B-129 ...........................................................................................36, 38

N.J.S.A. § 34:1B-129(e ...............................................................................................8

N.J.S.A. § 34:1B-129(e)(1)-(10)...............................................................................35

82337830;1

N.J.S.A. § 59:13-2 .......................................................................................................18

N.J.S.A. § 59:13-5 .......................................................................................................18

New Jersey Contractual Liability Act, N.J.S.A. § 59:13-1, *et. seq.* ..............1, 13, 18

**Rules**

Fed. R. Bankr. P. 8018(b)(1) ........................................................................................5

Federal Rule of Civil Procedure 12(b)(6) ..................................................................30

Federal Rule of Civil Procedure 15(a)(2) ..................................................................16

**Other Authorities**

Restatement (Second) of Contracts § 237 (1981) ......................................................37

11 Williston on Contracts § 30:19 (4th ed. 2024) .....................................................19

82337830;1

## JURISDICTIONAL STATEMENT

The basis for the bankruptcy court's subject matter jurisdiction in this case is 28 U.S.C. § 1334(a) as a case under title 11. The District Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a). An order denying a motion to amend a complaint is a final order for purposes of 28 U.S.C. § 158(a). *The Order Denying Plaintiff's Motion for Leave to File An Amended Complaint* was entered on May 19, 2025. Appellant's Notice of Appeal was timely filed on May 30, 2025.

## STATEMENT OF THE ISSUE PRESENTED
## AND STANDARD OF REVIEW

*First Issue Presented*

Whether the Bankruptcy Court committed reversible error by denying Plaintiff's Motion for Leave to File Amended Complaint?

The Court reviews an order denying a motion to amend a complaint for an abuse of discretion. *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000); *Mid-American Salt, LLC v. Morris County Cooperative Pricing Council*, 964 F.3d 218, 230 (3d Cir. 2020).

*Second Issue Presented*

Whether the Bankruptcy Court committed reversible error by holding that the New Jersey Contractual Liability Act, N.J.S.A. § 59:13-1, *et. seq.*, applies to the contracts between the Debtors and Defendant/Appellee?

The bankruptcy court's interpretation of a statute is a legal conclusion and is reviewed *de novo*. *Michael J. Wright Const. Co. v. Kara Homes, Inc.*, 396 B.R. 131, 135 (D.N.J. 2008). The interpretation of an unambiguous contract is also reviewed *de novo*. *Adler v. Gruma Corp.*, 135 F.4th 55, 64 (3d Cir. 2025).

*Third Issue Presented*

If the New Jersey Contractual Liability Act does apply to the contracts between Debtors and Defendant/Appellee, did the Bankruptcy Court commit reversible error by holding that Plaintiff/Appellant did not substantially comply with the New Jersey Contractual Liability Act?

The bankruptcy court's interpretation of a statute is a legal conclusion and is reviewed *de novo*. *Michael J. Wright Const. Co. v. Kara Homes, Inc.*, 396 B.R. 131, 135 (D.N.J. 2008); *Kollar v. Miller*, 176 F.3d 175, 178 n.2 (3d Cir. 1999) (explaining that an appellate court's review of a lower court's interpretation of a statute is plenary).

*Fourth Issue Presented*

Whether the Bankruptcy Court committed reversible error by holding that Plaintiff/Appellant's filing of an amended complaint would be futile because of certain provisions in the contracts between Debtors and Defendant/Appellee?

The interpretation of an unambiguous contract is reviewed *de novo*. *Sköld v. Galderma Lab'ys L.P.*, 917 F.3d 186, 191 n.9 (3d Cir. 2019).

2

## INTRODUCTION

This appeal arises out of contracts entered into by the Debtors and Defendant/Appellee, the New Jersey Economic Development Authority ("NJEDA") beginning in 2006 for the payment of grants and, subsequently, tax credits to the Debtors in exchange for the Debtors creating jobs in New Jersey. The Debtors upheld their end of the bargain and created over 5,200 jobs in the State of New Jersey by moving and expanding an existing warehouse facility in New Jersey and expanding their corporate headquarters location in New Jersey. This job creation resulted in approximately $29 million of additional tax revenue from 2011 to 2021 to the State of New Jersey. In reliance on the agreements with the NJEDA, the Debtors built, relocated, and expanded facilities in New Jersey, hired thousands of employees in New Jersey and remitted payroll and other taxes to New Jersey for more than 15 years.

However, despite the Debtors' compliance with the contracts, the NJEDA failed to pay any grants or issue any tax credits to the Debtors that were due and owing since 2011 – despite repeated correspondence from the NJEDA stating that that the grants or tax credits for particular years had been approved. Over the years, the Debtors continually pursued performance updates with the NJEDA regarding the status of the payment of grants and tax credits. The Debtors even sent letters to the

3

New Jersey governor and senate president complaining about the lack of payment of the grants and credits.

After the Debtors were forced to seek protection in the bankruptcy court and liquidate their businesses, the Debtors hired an outside accounting firm to initiate additional follow-up contact with the NJEDA regarding issuance of the tax credits. Subsequently, Plaintiff/Appellant, Michael Goldberg as Plan Administrator (the "Plan Administrator") hired a New Jersey law firm, who had experience with the NJEDA, to attempt to get the tax credits issued. The firm had at least two meetings with top NJEDA officials – all to no avail.

After exhausting all options for attempting to work consensually with the NJEDA to have the tax credits issued, the Plan Administrator filed an adversary complaint with the bankruptcy court for breach of contract and turnover of the tax credits. Despite being a state government agency who "must turn square corners" instead of exploiting litigational or bargaining advantages according to one recent New Jersey state court opinion involving the NJEDA, the NJEDA instead relied upon a technical requirement of New Jersey law (which does not to apply to NJEDA) and the Debtors' forced liquidation of its businesses to have the bankruptcy court throw out the Plan Administrator's case. The Plan Administrator now appeals to this Court for review of that decision.

## STATEMENT OF THE CASE

### A.   Bankruptcy Case Background

On April 23, 2023, (the "Petition Date"), each of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). (Adv. Doc. 1 at 3)[1] The Debtors continued to operate their businesses and manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code until the Effective Date of the Plan (each, as defined below). (*Id*.) No trustee or examiner has been appointed in this case. (*Id*.)

On September 14, 2023 (the "Confirmation Date"), the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates* (the "Confirmation Order"), confirming the *Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* (as amended, the "Plan"). (Adv. Doc. 1 at 3.)

---

[1] Citations to the Record are to the pleadings filed with the Bankruptcy Court cited by Adversary Proceeding docket number and page in the form of (Adv. Doc. X at Y) with X representing the Bankruptcy Court docket number and Y representing the page number of the pleading. Pursuant to Fed. R. Bankr. P. 8018(b)(1), Appellant has filed an Appendix to accompany this Brief containing all pleadings cited in this Brief which has been bookmarked for ease of reference.

82337830;1

On September 29, 2023, the effective date of the Plan occurred (the "Effective Date"). (Adv. Doc. 1 at 3). On the Effective Date, Michael Goldberg became the Plan Administrator of the Debtors (the "Plan Administrator") and, as a result, became the sole representative of the Debtors and assumed responsibility for, *inter alia,* investigating, prosecuting and compromising any and all of the Debtors' claims and causes of action. (*Id*.)

Pursuant to the Certificate of Amendment of the Certificate of Incorporation of Bed Bath & Beyond, Inc. which was filed with the State of New York Department of State on September 21, 2023, the name of the entity formerly known as "Bed Bath & Beyond, Inc." was changed to 20230930-DK-Butterfly, Inc. (Adv. Doc. 1 at 2).

### B.    Factual Background

Prior to the commencement of the bankruptcy cases, the Debtors were leading retailers throughout the United States. (Adv. Doc. 1 at 4).

On or about December 4, 2006, the Debtor formerly known as Bed Bath & Beyond, Inc. ("BBB") entered into a Grant Agreement (the "Woodbridge Agreement") with NJEDA which provided that NJEDA would pay BBB monetary grants in exchange for BBB establishing a distribution center in Woodbridge, New Jersey, which resulted in the creation of a minimum of 2,660 new jobs in New Jersey. (Adv. Doc. 24-1 at 2-41.)

6

Also on or about December 4, 2006, Christmas Tree Shops, Inc., which was formerly a wholly owned subsidiary of BBB, entered into a Grant Agreement (the "CTS Agreement") with NJEDA which provided that NJEDA would pay CTS monetary grants in exchange for CTS building and expanding a distribution center in Florence, New Jersey, which resulted in the creation of a minimum of 162 new jobs in New Jersey. (Adv. Doc. 1 at 4; Adv. Doc. 1-1 at 1-30.)

On July 25, 2011, BBB, and the Debtors formerly known as Bed Bath & Beyond of California LLC (now known as 20230930Butterfly-36, LLC), Liberty Procurement Company (formerly known as Bed Bath & Beyond Procurement Co.), BBB Value Services, Inc., (now known as 20230930-DK-Butterfly-1, Inc.), Buy Buy Baby Stores, Inc., Harmon Stores, Inc., and Christmas Tree Shops, Inc. (collectively and together with BBB, the "BEIP Debtors") entered into a BEIP Grant Agreement (the "Headquarters Agreement") with NJEDA. (Adv. Doc. 1 at 4; Adv. Doc. 1-2 at 1-42.) The Headquarters Agreement provided that NJEDA would pay the BEIP Debtors monetary grants in exchange for relocating a significant portion of their headquarters location from New York by significantly expanding their existing headquarters location in Union, New Jersey, resulting in the creation of a minimum of 2,440 new jobs in New Jersey. (*Id.*)

If the NJEDA had not promised the credits and incentives set forth in the Woodbridge Agreement, the CTS Agreement, and the Headquarters Agreement, the

7

BEIP Debtors would not have expanded the distribution centers or relocated their headquarters location to New Jersey and invested in or created the level of employment, jobs and resulting payroll tax revenue to the State of New Jersey that they did in reliance on the promised credits and incentives. (Adv. Doc. 1 at 4; Adv. Doc. 41-1 at 4-5. )

Each of the Woodbridge Agreement, the CTS Agreement and the Headquarters Agreement (collectively, the "Agreements") at section 4.D. provides that the grant payments would be paid to the BEIP Debtors on a yearly basis upon submission of the required documents by the BEIP Debtors to the NJEDA and the certification by the State Treasurer. (Adv. Doc. 1-1 at 13; Adv. Doc. 1-2 at 8; Adv. Doc. 24-1 at 14).

Effective July 11, 2016, the Agreements were amended to provide that the grant monetary payments owed under the Agreements would be converted to tax credits to be used for New Jersey franchise tax. (Adv. Doc. 1-3 at 1, 5; Adv. Doc. 24-6 at 1). Additionally, a 2015 amendment to the Business Employment Incentive Program, N.J.S.A. § 34:1B-124, *et. seq*., provided that the approved tax credits would be issued in staggered amounts over several years. (N.J. L. 2015, c. 194; N.J.S.A. § 34:1B-129(e.))

Other than limited payments for years 2008-2010 and a small partial payment for years 2011-2013, the NJEDA has not paid the BEIP Debtors any of the grants or

8

tax credits for years 2011-2020 due and owing under the Agreements, notwithstanding the job creation and tax revenue creation by the BEIP Debtors during these periods.  (Adv. Doc. 1 at 7).

Over the years, NJEDA sent correspondence to the BEIP Debtors stating that the tax credits for specific years had been approved and certified by the New Jersey Division of Taxation (the "Division") as required by the Agreements and applicable statutes. (Adv. 41-1 at 7-12, 156-185.) This correspondence is detailed in the Plan Administrator's proposed Amended Complaint. (*Id*.) However, none of the tax credits were ever actually issued, other than a small payment for the Woodbridge Agreement in 2017, even though the BEIP Debtors provided all required documents and paid servicing fees required for the issuance of the tax credits. (Adv. 41-1 at 7-12).

Over the years, the BEIP Debtors continually inquired with NJEDA regarding issuance of the outstanding tax credits, including sending letters to the New Jersey governor and senate president regarding NJEDA's lack of payment under the Agreements. (Adv. Doc. 41-1 at 12-14; Adv. Doc. 41-2 at 1-3.)  NJEDA offered excuse after excuse over the years regarding why the tax credits had not been issued, including requiring a modification agreement to the Headquarters Agreement to reflect a name change of one of the BEIP Debtors (despite the fact that it was the same company and only its name was changed) which NJEDA sat on and did not

9

approve for six years. (Adv. 41-1 at 11).  During that six years, NJEDA refused to issue any tax credits because the modification had not yet been approved. (*Id*.) In other words, NJEDA required the BEIP Debtors to submit a modification agreement before it would issue any tax credits, the modification agreement was being required for a mere name change, but then did not approve the modification for **six years**. (*Id*.) The modification was submitted in 2017 but not approved until February 6, 2023. (*Id*.) Additionally, the modification only affected the Headquarters Agreement and not the Woodbridge or CTS Agreement, yet NJEDA did not issue tax credits for those agreements. (*Id*.)

Attempts to obtain the certified, but not paid, tax credits began in earnest in early 2023. (Adv. Doc. 41-1 at 13). On February 6, 2023, representatives of the Deloitte accounting firm, who had been retained by the BEIP Debtors to work on obtaining the tax credits, had a call with NJEDA regarding the outstanding tax credits and were told that modification agreements to the Headquarters Agreement and CTS Agreement had been approved and once they were processed, NJEDA would work with the Division to begin to release some of the past due credits. (*Id*.) After the modification to the Headquarters Agreement was finally approved on February 6, 2023, the BEIP Debtors expected that the outstanding tax credits would finally be issued, and yet NJEDA still failed to issue any tax credits under the Agreements. (*Id*.)

82337830;1

In another attempt to obtain the outstanding tax credits from NJEDA, the BEIP Debtors held a meeting with the NJEDA on June 8, 2023 to insist that the tax credits be issued. (Adv. Doc. 41-1 at 13). However, instead of issuing the tax credits, by letters dated August 7, 2023 (the "Termination Letters"), the NJEDA provided written notice of the BEIP Debtors' default under the Agreements for failing to maintain the required minimum number of jobs for years 2021-2022 only and allegedly terminating the Agreements. (Adv. Doc. 41-1 at 13, 187-190). The NJEDA had not previously provided written notice to the BEIP Debtors of their default under the Agreements for failing to maintain jobs. (Adv. Doc. 41-1 at 13-14). Sections 14 and 15 of the Agreements require written notice of any default to be given and that default remedies can only be exercised by NJEDA if written notice was first provided. (Adv. Doc. 1-1 at 20-22; Adv. Doc. 1-2 at 13-14; Adv. Doc. 24-1 at 21-22). There is no exception in these sections of the Agreement for defaults which cannot be cured, such as a failure to maintain the required number of jobs in a previous year. (*Id.*)

After the Termination Letters were issued, the Plan Administrator retained attorneys who had experience with the NJEDA to work with NJEDA to try to recover the unpaid tax credits. (Adv. Doc. 41-1 at 14; Adv. Doc. 41-2 at 1-3). On October 27, 2023, the Plan Administrator's attorneys had a phone call with Bruce Ciallella, the Chief Operations Officer for NJEDA, regarding their representation of the Plan

82337830;1

Administrator and requesting to schedule a meeting with the appropriate representatives of NJEDA to discuss the unpaid tax credits. (Adv. 41-2 at 2). That same day the Plan Administrator's attorneys sent a follow-up email to Mr. Ciallella requesting a meeting to discuss the unpaid tax credits. (*Id*.) Despite several follow-ups, no one from NJEDA responded to the request for a meeting until November 30, 2023. (*Id*.) The meeting was finally held on December 11, 2023 by Zoom videoconference call with the Plan Administrator's attorneys, a representative from Deloitte, and Mr. Ciallella and Susan Greitz, the Director of Incentives – Relationship Management of NJEDA to discuss the unpaid tax credits. (*Id*.) Mr. Ciallella and Ms. Greitz indicated that they would look into whether it would be possible to pay at least some of the unpaid tax credits to the BEIP Debtors. (Adv. Doc. 41-2 at 3). Thus, as late as that call and up until February 29, 2024, the BEIP Debtors reasonably believed that payment might be forthcoming since the amounts were clearly due. (*Id*.) After again several follow-up emails were sent to Mr. Ciallella and Ms. Greitz regarding the status of NJEDA's internal review of whether it would be possible to pay the tax credits to the BEIP Debtors, on February 29, 2024, another conference call meeting was held with the Plan Administrator's attorneys and Ms. Greitz who indicated that the tax credits could likely not be paid due to the BEIP Debtors' bankruptcy filing and alleged default under the Agreements. (*Id*.)

### C.    Procedural Background

On June 3, 2024, the Plan Administrator filed an adversary complaint with the Bankruptcy Court for breach of contract for the NJEDA's repeated breach of the Agreements and for turnover of the tax credits. (Adv. Doc. 1). On August 15, 2024, the NJEDA filed its answer and affirmative defenses to the Plan Administrator's complaint. (Adv. Doc. 19).

On December 6, 2024, NJEDA filed a motion for judgment on the pleadings arguing that the New Jersey Contractual Liability Act at N.J.S.A. § 59:13-1, *et. seq.* (the "CLA") barred the Plan Administrator's complaint because the Plan Administrator had filed to provide notice of his claim to the NJEDA within 90 days of the accrual of his claim, and that the BEIP Debtors forfeited all unpaid tax credits due to its failure to maintain the required number of jobs in New Jersey in 2021 and 2022. (Adv. Doc. 22). In response, the Plan Administrator argued that the CLA did not apply to the NJEDA and that NJEDA could not terminate the Agreements because it failed to provide written notice to the BEIP Debtors of their default pursuant to the terms of the Agreements. (Adv. Doc. 30). After a hearing on the motion held on January 14, 2025, the Bankruptcy Court granted NJEDA's motion for judgment on the pleadings without prejudice to the Plan Administrator's right to file a motion for leave to file an amended complaint. (Adv. Doc. 35; Adv. Doc. 37). The Bankruptcy Court's order also required the NJEDA to submit additional briefing

13

regarding why the Termination Letters were effective for the NJEDA to withhold all unpaid tax credits from the BEIP Debtors. (Adv. Doc. 35). The Bankruptcy Court held that the CLA did apply to the Agreements and since there was no allegation in the complaint that the BEIP Debtors complied with the CLA by providing notice to the NJEDA before filing the complaint, the complaint had to be dismissed. (Adv. Doc. 35 at 11-13, 23). However, the Bankruptcy Court left open the issue of whether the NJEDA had properly terminated the Agreements since it had failed to provide notice of default and an opportunity to cure to the BEIP Debtors prior to issuing the Termination Letters. (Adv. Doc. 35 at 23-24; Adv. Doc. 37).

On March 6, 2025, the Plan Administrator filed his motion for leave to file amended complaint and the NJEDA filed its supplemental memorandum regarding the sufficiency of the Termination Letters. (Adv. Doc. 41; Adv. Doc. 42). A hearing was held on the Plan Administrator's motion to amend complaint on May 13, 2025. (Adv. Doc. 52). The Plan Administrator argued that the BEIP Debtors had substantially complied with the CLA through the years of contacts with the NJEDA regarding the unpaid tax credits, and particularly, the several meetings held with top NJEDA officials in the year prior to the filing of the complaint and that NJEDA was clearly on actual notice of the BEIP Debtors' claims. (Adv. Doc. 41 at 11-15). The Plan Administrator also argued that amending the complaint would not be futile because, had the NJEDA complied with the terms of the Agreements, the BEIP

14

Debtors should have already been paid a majority of the tax credits prior to their alleged default beginning in 2021 for failing to maintain the required number of jobs. (Adv. Doc. 41 at 16-19).

In denying the Plan Administrator's motion to amend the complaint, the Bankruptcy Court held that the BEIP Debtors had not substantially complied with the CLA because no written notice of their claims against the NJEDA was given to the NJEDA (despite the fact that NJEDA was on actual notice). (Adv. Doc. 52 at 39, 45). The Bankruptcy Court also held that NJEDA breached the Agreements by not giving the BEIP Debtors notice of default and an opportunity to cure before issuing the Termination Letters but that, even if the NJEDA had provided notice of the default, the BEIP Debtors could not have cured their failure to maintain the required number of jobs in 2021 and 2022, if NJEDA had given notice in a subsequent year such that there are no damages for NJEDA's failure to give notice. (Adv. Doc. 52 at 48-50). The Bankruptcy Court entered its order denying the Plan Administrator's motion to amend complaint with prejudice on May 19, 2025. (Adv. Doc. 51). The Plan Administrator timely filed his notice of appeal to this Court. (Adv. Doc. 56).

## SUMMARY OF THE ARGUMENT

It is black letter law that leave to amend a complaint must be freely given and the Plan Administrator must be given leave to amend his complaint. In this case, the CLA does not apply by its clear terms as incorporated into the Agreements and,

15

therefore, the fact that the BEIP Debtors did not provide written notice to the NJEDA within 90 days of the accrual of their claims does not bar the Plan Administrator's complaint. Further, even if the CLA does apply to the Agreements, the BEIP Debtors and the Plan Administrator substantially complied with the CLA by the numerous meetings held with senior NJEDA officials in 2023 and 2024. Finally, the NJEDA cannot use the BEIP Debtors' default of the Agreements in 2021 and 2022 as an excuse to withhold payment of all unpaid tax credits when the NJEDA itself breached the Agreements first by failing to pay the tax credits when due. A party who breaches a contract cannot, thereafter, be excused from performance of the contract by the counter-party's subsequent breach.

## **ARGUMENT**

**I.    The Bankruptcy Court Committed Reversible Error By Denying the Motion for Leave to File Amended Complaint Because Leave to File an Amended Complaint Must Be Freely Given**

With respect to amendment of pleadings, Federal Rule of Civil Procedure 15(a)(2) states that, "The court should freely give leave when justice so requires." Unless the opposing party will be prejudiced, leave to amend should generally be allowed. *Eddy v. Virgin Islands Water & Power Auth.*, 256 F.3d 204 (3d Cir. 2001). As the Supreme Court explained in *Foman v. Davis*, 371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962), leave to amend a complaint should be freely given in the absence of any apparent or declared reasons such as undue delay, bad

16

faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to opposing party

by virtue of allowance of the amendment, and futility of the amendment. In this case,

there has been no undue delay, bad faith or dilatory motive by the Plan

Administrator, this was the first amendment requested by the Plan Administrator,

there would be no undue prejudice to the NJEDA by allowing the amendment, and

the amendment would not be futile. Accordingly, the Bankruptcy Court committed

reversible error by denying the Plan Administrator's motion to amend the complaint.

## II.    The Bankruptcy Court Erred In Holding That The New Jersey Contractual Liability Act Applied To The Agreements

The Bankruptcy Court incorrectly held that the provisions of the CLA apply

to the Agreements and that, therefore, the Plan Administrator's claims are barred

because he failed to give written notice of his claims to the NJEDA within 90 days

of the accrual of his claims. The CLA provides in relevant part,

> [N]o notice of claim for breach of contract, either express
> or implied in fact, shall be filed with the contracting
> agency later than 90 days after the accrual of such claim.
> A notice of claim shall include the following information:
> the name of the claimant, the nature of the claim, specific
> reasons for making the claim, and the total dollar amount
> of the claim if known. After the expiration of 90 days from
> the date the notice of claim is received by the contracting
> agency, the claimant may file suit in a court of competent
> jurisdiction of the State of New Jersey.
>
> In all contract claims against the State, the claimant shall
> be forever barred from recovering against the State if:

17

> a. he fails to notify the appropriate contracting agency within 90 days of accrual of his claim . . . .

N.J.S.A. § 59:13-5.

The CLA would normally not apply to the to the NJEDA by its terms because it does not apply to any agency of the State which is statutorily authorized to sue and be sued. *See* N.J.S.A. § 59:13-2. The NJEDA is a state agency that has the authority to sue and be sued. *See* N.J.S.A. § 34:1B-5.

However, each of the Agreements states, "The rights and remedies of Grantor under this Agreement shall be subject to the New Jersey Contractual Liability Act, N.J.S.A. 59:13-1 et. seq., the provisions of which are hereby incorporated herein by reference." (Adv. Doc. 1-1 at 28; Adv. 1-2 at 17; Adv. 24-1 at 28). If the "provisions" of the CLA are incorporated into the Agreements, then all provisions of the CLA are incorporated, including the provision stating that the CLA does not apply to agencies that can sue and be sued.

Specifically, the CLA defines "State" for purposes of the Act as "the State and any office, department, division, bureau, board, commission or agency of the State, but shall not include any such entity which is statutorily authorized to sue and be sued." N.J.S.A. § 59:13-2 (emphasis added). The New Jersey Economic Development Authority Act which formed the NJEDA provides that, "The authority [NJEDA] shall have the following powers: . . . c. To sue and be sued." As a result,

18

the NJEDA does not fall within the definition of "State" for purposes of the CLA and the CLA does not apply to the NJEDA.

If all provisions of the CLA are incorporated by reference into the Agreements, then the definition of "State" in the CLA is also incorporated into the Agreements. The NJEDA cannot cherry pick provisions of the CLA to incorporate into the Agreements to suit its purposes. "When a contract expressly incorporates a statutory enactment by reference, that enactment becomes part of the contract for the indicated purposes just as though the words of that enactment were set out in full in the contract." 11 Williston on Contracts § 30:19 (4th ed. 2024). *See also Vegas United Inv. Series 105, Inc. v. Celtic Bank Corp.*, 135 Nev. 456, 459, 453 P.3d 1229, 1232 (Nev. 2019) (explaining that when a contract incorporates a statutory provision by reference, that statutory language is interpreted as though set out in the contract in full).

Had it wished to incorporate only a portion of the CLA into the Agreements (which it drafted), the NJEDA could have done that. "It is well established that parties who are not subject to a statute may choose to use parts of the statute to define their relationship without bringing the full force of the statute to bear." *Craddock Int'l Inc. v. W.K.P. Wilson & Son, Inc.*, 116 F.3d 1095, 1107–08 (5th Cir. 1997). *See also Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.*, 373 F.3d 1100, 1108 (10th Cir. 2004) (explaining that an intent to modify applicable law by contract

is effective only when it is expressly stated in the contract). In this case, the Agreements incorporate by reference the full CLA, including the definitions provision which excludes the NJEDA from its application. If the NJEDA wished to exclude that definitions provision from the Agreements, it could have done so. "[P]arties in New Jersey are ... presumed to have contracted with reference to the existing law." *Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C. v. Lowenstein Sandler, P.C.*, 365 N.J. Super. 241, 248, 839 A.2d 52, 56 (App. Div. 2003) *quoting Silverstein v. Keane,* 19 N.J. 1, 13, 115 A.2d 1, 7 (1955). The NJEDA knew that the provisions of the CLA do not apply to it and could have expressly provided in the Agreements that that provision of the CLA was not incorporated into the contracts. But NJEDA did not do that and therefore the CLA as a whole is incorporated into the Agreements.

The NJEDA argued below and the Bankruptcy Court agreed that if the NJEDA has no rights under the CLA, the provision incorporating it into the Agreements would be rendered a nullity and would not comport with the "common sense" rule of contract interpretation. (Adv. Doc. 31 at 9). However, the more relevant rule of contract construction is that if the terms of a contract are "are clear and unambiguous, there is no room for construction and the court must enforce those terms as written." *C.L. v. Div. of Med. Assistance & Health Servs.*, 473 N.J. Super. 591, 599, 284 A.3d 860, 865 (App. Div. 2022). *See also JPC Merger Sub LLC v.*

20

*Tricon Enterprises, Inc.*, 474 N.J. Super. 145, 161, 286 A.3d 1186, 1195 (App. Div. 2022) (if the language of contract is clear and unambiguous, a court must enforce the agreement as written). In this case, the language incorporating the CLA into the Agreements is clear and unambiguous and must be enforced as written. The entire CLA is incorporated into the Agreements and under the provisions of the CLA, it does not apply to NJEDA and therefore the CLA does not apply in this case.

In addition, the Court below speculated without any factual support that the incorporation of the CLA into the Agreements would be meaningless if it were not intended to impose the notice deadlines, even though the Agreements themselves otherwise do not contain these provisions.  However, there are multiple reasons one could speculate why the NJEDA did intend to incorporate the CLA as written even though the CLA does not apply to claims against entities like the NJEDA that can sue and be sued.  For example, including a provision in a contract drafted by a state agency could easily be a "checklist" item that all state agencies add to contracts so that when the CLA does apply, it's in the contract.  The parties could speculate about other reasons as well, but in the end the court should resort to the plain language of the Agreements rather than to speculation about what may or may not have been intended.  Finally, the provision in the Agreements providing that the CLA applies to the Agreements actually clarifies that the CLA does not apply, which would not have been as certain had it not been incorporated into the Agreements.

82337830;1

**III.    Alternatively, the Bankruptcy Court Committed Reversible Error in Holding that the Plan Administrator Did Not Substantially Comply With the New Jersey Contractual Liability Act**

In the alternative, if the Court finds that the CLA does apply to the NJEDA, the BEIP Debtors and the Plan Administrator substantially complied with the notice provision of the CLA and the NJEDA was clearly on notice of the BEIP Debtors' claims, which is the whole purpose of the notice requirement in the CLA. The BEIP Debtors and Plan Administrator substantially complied with the notice provision of the CLA through their constant communications and meetings with NJEDA throughout 2023 and into 2024. In addition, the BEIP Debtors were led to believe that the NJEDA would ultimately fulfill its clear contractual obligations, so the Plan Administrator clearly communicated his expectations that the BEIP Debtors should be paid thereby putting the NJEDA on notice, but the NJEDA only delayed and made excuses about its own compliance and obligations.

The purpose of the requirement that state agencies be given notice of claims against the State before a lawsuit may be filed is to give the agency an opportunity to investigate the merits of the claim "for the possibility of a settlement, as well as to investigate the claims for the purpose of preparing for trial." *Frapaul Const. Co. v. State, Dep't of Transp.*, 175 N.J. Super. 84, 92, 417 A.2d 592, 596 (App. Div. 1980). *See also Dixon v. JPay, Inc.*, No. A-4498-19, 2022 WL 1510747, at *4 (N.J. Super. Ct. App. Div. May 13, 2022) (same). "The comment accompanying the Act

permitting claims to be brought against public entities states that the notice and filing requirements "provide a sufficient period of time within which the appropriate State agency and the Attorney General may take administrative action to adjust the dispute." *W.V. Pangborne & Co. v. New Jersey Dep't of Transp.*, 116 N.J. 543, 562–63, 562 A.2d 222, 232 (1989). *See also Cnty. of Morris v. Fauver*, 153 N.J. 80, 107, 707 A.2d 958, 971 (1998) (explaining that the purpose of the notice provisions of the CLA is to give state agencies an opportunity to determine the merits of the claim and the possibility of a settlement).

Additionally, a notice of claim under the CLA "need not take a prescribed form." *Harrington v. Dir., Div. of Tax'n*, No. 009529-2011, 2015 WL 1084865, at \*4 (N.J. Tax Ct. Mar. 2, 2015). Instead, it merely has to "convey four pieces of information" which is the claimant's name, the nature of the claim, the reasons for making the claim and the amount of the claim if known. *Id.*

In *Cnty. of Hudson v. State, Dep't of Corr.*, No. A-3511-05T2, 2007 WL 1836883, at \*3 (N.J. Super. Ct. App. Div. June 28, 2007), the court held that a letter sent by the County was sufficient to provide the required notice to the State under the CLA of the County's claims even though it did not contain an express reference to the "potential for 'submission of claim' or state that its purpose was to give notice pursuant to the CLA."

> The doctrine of substantial compliance is an equitable one which is utilized "to avoid the harsh consequences that

23

> flow from technically inadequate actions that nonetheless
> meet a statute's underlying purpose." *Galik v. Clara
> Maass Med. Ctr.,* 167 N.J. 341, 352, 771 A.2d 1141
> (2001). Thus, the doctrine operates "to prevent barring
> legitimate claims due to technical defects." *Lebron v.
> Sanchez,* 407 *N.J.Super.* 204, 215, 970 *A.*2d 399 (App.
> Div. 2009) applying doctrine of substantial compliance to
> notice requirement of Tort Claims Act). In general, it rests
> on a demonstration that a party took "a series of steps ... to
> comply with the statute involved," and those steps
> achieved the statute's purpose, as for example, providing
> notice.

*Cnty. of Hudson v. State, Dep't of Corr.*, 208 N.J. 1, 21–22, 26 A.3d 363, 375 (2011).

The court in *Eze v. Rowan Univ.*, No. A-2659-07T2, 2009 WL 232181 (N.J.

Super. Ct. App. Div. Feb. 3, 2009) held that an assistant professor who sent letters

to a state university stating his grievances gave adequate notice of his contractual

rights claim, even though the letters did not expressly set forth that a lawsuit was to

be filed. The professor had been denied tenure at the university and believed that his

contractual rights had been violated. The court held that the professor gave the

university ample opportunity to review his assertions, attempt a settlement, and to

gather information for litigation. As the court explained,

> Substantial compliance, however, is based on the notion
> that substantially all of the required information has been
> given to those to whom the notice should be given and that
> it has been given in a form which should alert the recipient
> to the fact that a claim is being asserted against the
> sovereign. To put it another way, substantial compliance
> means that the notice has been given in a way, which
> though technically defective, substantially satisfies the
> purposes for which notices of claims are required.

24

> Notification requirements have been recognized as serving two purposes: (1) to allow at least six months for administrative review so as to permit settlement of meritorious claims, and (2) to provide prompt notice in order to permit adequate investigation and proper defense.

*Eze,* 2009 WL 232181 at * 5 *quoting Lameiro v. West New York Bd. of Educ.*, 136 N.J. Sup. 585, 588, 347 A.2d 377 (Law Div. 1975). The court held that the university was "well aware" that the professor had claims against the university and had ample opportunity to review his claims and enter into a settlement if they wished to do so.

Likewise, in this case, the NJEDA was well aware that the BEIP Debtors asserted claims for the unpaid tax credits and had ample opportunity to settle those claims, had they wished to do so. For over a decade, the BEIP Debtors submitted their credit applications, responded to endless follow-up requests from the NJEDA, and hired both accounting and legal experts to assist in dealing with the NJEDA on performance and payment of the tax credits. Subsequently the Plan Administrator tried to work with NJEDA in good faith for over a year to obtain the unpaid tax credits to no avail. The NJEDA cannot now claim that they had no notice of the BEIP Debtors' claims.

> In considering a substantial compliance claim, a court must analyze the following factors: (1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute.

25

*Strategic Dev. Grp., LLC v. New Jersey City Univ.*, No. A-1576-23, 2024 WL 3169850, at \*6 (N.J. Super. Ct. App. Div. June 26, 2024). *See also Zamel v. Port of New York Auth.*, 56 N.J. 1, 7, 264 A.2d 201, 204 (1970) (holding that notice sent to a state agency was sufficient for purposes of the CLA when the agency had adequate time for investigation of the claim, a reasonable opportunity for the preparation of its defense, and a reasonable opportunity to effect a settlement before the institution of suit).

In this case, the purpose of the CLA was met because NJEDA was clearly on notice of the BEIP Debtors' claims for the unpaid tax credits through the extensive communication and meetings with NJEDA throughout 2023 and early 2024. The BEIP Debtors' accountants and subsequently the Plan Administrator's attorneys had no less than **five** phone calls and video conference meetings with senior NJEDA officials between February 6, 2023 and February 24, 2024, each of which communicated the BEIP Debtors' claims to the tax credits. The first phone call between the Plan Administrator's attorneys and the NJEDA regarding the unpaid tax credits was held within 90 days of the date of the Termination Letters, which is arguably the date of the accrual of the Plan Administrator's claims. The Termination Letters are dated August 7, 2023 and the Plan Administrator's attorneys first made contact by telephone with NJEDA on October 27, 2023 requesting a meeting with NJEDA to discuss the unpaid tax credits. (Adv. Doc. 41-2 at 2). It then took five

26

follow-up emails from the Plan Administrator's attorneys to get NJEDA to even respond with proposed dates for a meeting. (*Id*.) The Plan Administrator's attorney sent emails to the Chief Operations Officer of NJEDA on October 27, 2023 (after the phone call), November 6, 2023, November 15, 2023, November 27, 2023, and November 30, 2023 requesting proposed dates for a meeting with NJEDA. (*Id*.) The Chief Operations Officer, Mr. Ciallella, finally responded on November 30, 2023 and the meeting was held by Zoom video conference on December 11, 2023. (*Id*.) At the meeting, Mr. Ciallella and Ms. Greitz, the Director of Incentives – Relationship Manager of NJEDA, indicated that they would look into whether it would be possible to pay at least some of the unpaid tax credits to the Debtors. (Adv. Doc. 41-2 at 3). At this point, the Plan Administrator still believed that is was possible that the NJEDA would pay the overdue tax credits without litigation.

The Plan Administrator's attorney sent a follow-up email to Mr. Ciallella and Ms. Greitz on December 20, 2023 inquiring regarding the status of their internal discussions to possibly pay at least some of the unpaid tax credits to the Debtors and then sent additional follow-up emails on January 9, 2024 and January 16, 2024, because he did not receive a response to his December 20, 2023 email. (Adv. Doc. 41-2 at 3). On January 16, 2024, Ms. Greitz responded that they were still reviewing the matter internally and with NJEDA's counsel and promised to provide an update the following week. (*Id*.) The Plan Administrator's attorney sent follow-up emails

27

on January 22, 2024 and January 30, 2024 to Ms. Greitz and Mr. Ciallella again inquiring regarding the status of their internal discussions. (*Id*.) Finally, on February 29, 2024, the Plan Administrator's attorney had another conference call meeting with Ms. Greitz. At the meeting, Ms. Greitz indicated that the BEIP Debtors were considered to be in default twice under the grant agreements, first at the end of 2021 for not maintaining the required number of jobs and again in 2023 when the Debtors filed their bankruptcy case and closed all of their stores. (*Id*.) Ms. Greitz indicated that the tax credits due to be paid after 2021 could likely not be paid due to the Debtors' filing of bankruptcy and alleged default under the Agreements. (*Id*.)

As the court in *Frapaul Construction Company* explained, the notice provisions of the CLA are intended to give state agencies an opportunity to determine the merits of claims for the possibility of a settlement, as well as to investigate the claims. Here, the NJEDA had the opportunity to determine the merits of the BEIP Debtors' claims and settle those claims. As a result, the ***purpose of the notice requirement of the CLA was satisfied***.

The Bankruptcy Court held that the Plan Administrator did not substantially comply with the CLA because he did not provide written notice to the NJEDA of his claims. First, there were numerous written emails sent by the Plan Administrator's attorneys to the NJEDA in 2023 and early 2024. Additionally, the NJEDA was on actual notice of the claims. The CLA requires the claimant to provide: (1) the name

28

of the claimant, (2) the nature of the claim, (3) specific reasons for making the claim, and (4) the total dollar amount of the claim, if known. The NJEDA was on actual notice of each of these items. The NJEDA knew that the claimant was the BEIP Debtors and then, subsequently, the Plan Administrator. The NJEDA was on actual notice of the nature of the claims – the unpaid tax credits. The NJEDA was on actual notice of the Plan Administrator's specific reasons for making the claim – the BEIP Debtors fulfilled their end of the bargain by creating jobs in New Jersey and paying millions of dollars in taxes to the State of New Jersey. And the NJEDA was on actual notice of the total amount of the claims because those amounts were discussed between the Plan Administrator's attorneys and the NJEDA at their meetings. Again, the *purpose* of the NJEDA was met.

Furthermore, there is no prejudice to NJEDA in allowing the Plan Administrator's amended complaint – NJEDA has been on notice of the claim for the unpaid tax credits since at least early 2023. However, if the Court affirms the Bankruptcy Court's denial of the Plan Administrator's motion to amend complaint, the BEIP Debtors would be irrevocably prejudiced because it would prohibit the BEIP Debtors from recovering up to an estimated $19 million in tax credits or refunds. This Court should, therefore, reverse the decision of the Bankruptcy Court and find that the Plan Administrator substantially complied with the CLA.

29

## IV.    The Bankruptcy Court Erroneously Held That Filing The Amended Complaint Would Be Futile

In addition to holding that the Plan Administrator's claims against the NJEDA are barred because no written notice of his claims was sent to NJEDA pursuant to the CLA, the Bankruptcy Court also erroneously held that the Plan Administrator's filing of the proposed amended complaint would be futile because of certain provisions in the Agreements. In the Third Circuit, futility in the context of an amended complaint "means that the complaint, as amended, would fail to state a claim upon which relief could be granted. In assessing "futility," the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (internal citations omitted). *See also Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (explaining that the same legal standard for futility of amendment is that under Rule 12(b)(6)). Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." However, "[w]hen reviewing a motion to dismiss on the pleadings, courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *CBA Env't Servs., Inc. v. Toll Bros. Inc.*, 403 F. Supp. 3d 403, 410 (D.N.J. 2019). "[W]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement

30

to relief." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). In this case, the Plan Administrator's well-pleaded factual allegations in his proposed amended complaint do "plausibly give rise to an entitlement to relief" against the NJEDA for breach of the Agreements.

### A.    The NJEDA Cannot Use The BEIP Debtors' Default Under the Agreements In 2021 To Excuse Its Prior Breach of the Agreements That Began in 2011

The NJEDA argued to the Bankruptcy Court and the Bankruptcy Court held that amending the complaint in this case would be futile because the Agreements allow the NJEDA to withhold payment of all tax credits due to the BEIP Debtors' failure to maintain the required jobs in New Jersey beginning in 2021. However, under New Jersey law, a party cannot claim that the other party breached a contract unless the party was, itself, in compliance with the contract. *See City of Trenton v. Cannon Cochran Mgmt. Servs., Inc.*, No. A-5576-09T1, 2011 WL 3241579 at *4 (N.J. Super. Ct. App. Div. Aug. 1, 2011). Here, the NJEDA first breached the Agreements in 2011 by failing to pay the grants due under the prior versions of the Agreements and continued to breach the Agreements each and every year thereafter by failing to pay grants and later failing to issue tax credits. NJEDA cannot now claim that the BEIP Debtors breached the Agreements because the NJEDA itself was not in compliance with the Agreements.

82337830;1

The NJEDA relies upon paragraph 15.A.(3) of the Agreements which states,

> Upon the existence of any Event or Events of Default, the
> Grantor may, in its sole and absolute discretion do any of
> the following, alone or in combination, after having first
> given Grantee notice and opportunity to cure the default in
> accordance with Paragraph 14 hereof: . . . (3) withhold
> payment of all Grant payments not yet paid at the time of
> the default during such time as an Event or Events of
> Default remain uncured.

(Adv. Doc. 1-1 at 22; Adv. Doc. 1-2 at 14; Adv. Doc. 24-1 at 22). The NJEDA takes

the position that because it had failed to pay grants or issue tax credits beginning in

2011 through 2020 to the BEIP Debtors, that the BEIP Debtors' default of the

Agreements in 2021 allows the NJEDA to withhold all of the unpaid tax credits. This

position is nonsense because the NJEDA is essentially saying that because it

breached the Agreements by failing to issue the tax credits for nine years, that it can

now take advantage of that breach and withhold all tax credits for all years due to

the BEIP Debtors' failure to maintain the required number of jobs in New Jersey in

2021. The NJEDA should not be allowed to use its own prior breach of the

Agreements to penalize the BEIP Debtors.

The BEIP Debtors met all of the requirements of the Agreements through at

least the end of calendar year 2020 and are therefore entitled to the credits that they

were promised for those years, regardless of when the NJEDA sent the Termination

Letters. The amounts for those years were owed long before the year 2021, were

overdue to be paid and there was and is no doubt or dispute that this is the case.

32

Thus, the amounts due to the BEIP Debtors for all of the years prior to 2021 are immediately due and payable. The NJEDA's position is that the BEIP Debtors' default under the Agreements for allegedly failing to maintain the required number of jobs in 2021 and 2022 means that they are not entitled to *any* tax credits under the Agreements for *any* years, even for years and amounts that the NJEDA had agreed were due and payable. However, if NJEDA had *timely* paid the BEIP Debtors the grants and tax credits which they were owed, the tax credits would have been issued by the time of the BEIP Debtors' alleged default. The rules of contract construction in New Jersey are clear that the court cannot construe a contract (written and drafted by the NJEDA) in a manner that would produce an absurd or unreasonable result. If the Court were to affirm the Bankruptcy Court's ruling on this issue, the Court would be allowing the NJEDA to induce companies to move to New Jersey, refuse to pay amounts due under the Agreements, but to delay any action being brought against it based on delay and excuse, and then wait for years to find a technical default and escape payment of any amounts, when the reason the payments were never made in the first place was solely the fault of the NJEDA.

In 2015, the Business Employment Incentive Program, N.J.S.A. § 34:1B-124, *et. seq*., was amended to provide that the NJEDA's tax credits would be issued in staggered amounts over several years. *See* L. 2015, c. 194. The amendment provided that the tax credits would be issued as follows:

33

- For grants accrued but not paid during calendar years 2008 through 2013, the tax credit shall be issued in five installments over a five year period beginning in the 2017 tax accounting or privilege period of the business in the following percentages: 30% of the accrued amount in year 1; 30% of the accrued amount in year 2; 20% of the accrued amount in year 3; 20% of the accrued amount in year 4; and 10% of the accrued amount in year 5.

- For grants accrued but not paid during calendar years 2014 and 2015, the tax credit shall be issued in four equal installments over a four year period beginning in the 2019 tax accounting or privilege period of the business.

- For grants accrued but not paid during calendar years 2016 and 2017, the tax credit shall be issued in three equal installments over a three year period beginning in the 2020 tax accounting or privilege period of the business.

- For grants accrued but not paid during calendar years 2018 and 2019, the tax credit shall be issued in two  equal installments over a two year period beginning in the 2022 tax accounting or privilege period of the business.

82337830;1

- For grants accrued but not paid during calendar year 2020, the tax credit shall be issued in two equal installments over a two year period beginning in the 2023 tax accounting or privilege period of the business.

*See* N.J.S.A. § 34:1B-129(e)(1)-(10).

Under the provisions of this statute, the BEIP Debtors should have received the following tax credits for the Agreements under the following schedule, ***prior*** to termination of the Agreements:

- In 2017, the BEIP Debtors should have received 5% of the amounts owed for 2011-2013;

- In 2018, the BEIP Debtors should have received 20% of the amounts owed for 2011-2013.

- In 2019, the BEIP Debtors should have received (1) 25% of the amounts owed for 2011-2013; (2) 25% of the amounts owed for 2014; and (3) 25% of the amounts owed for 2015.

- In 2020, the BEIP Debtors should have received (1) 25% of the amounts owed for 2011-2013; (2) 25% of the amounts owed for 2014; (3) 25% of the amounts owed for 2015; (4) 33% of the amounts owed for 2016; and (5) 33% of the amounts owed for 2017.

- In 2021, the BEIP Debtors should have received (1) 25% of the amounts owed for 2011-2013; (2) 25% of the amounts owed for 2014; (3) 25% of the amounts owed for 2015; (4) 33% of the amounts owed for 2016; and (5) 33% of the amounts owed for 2017.

- In 2022, the BEIP Debtors should have received: (1) 25% of the amounts owed for 2014; (2) 25% of the amounts owed for 2015; (3) 33% of the amounts owed for 2016; (4) 33% of the amounts owed for 2017; (5) 50% of the amount owed for 2018; and (6) 50% of the amount owed for 2019.

- In 2023, the BEIP Debtors should have received: (1) 33% of the amounts owed for 2016; (2) 33% of the amounts owed for 2017; (3) 50% of the amount owed for 2018; (4) 50% of the amount owed for 2019; and (5) 50% of the amount owed for 2020.

Had the NJEDA complied with its clear legal obligations under the terms of the Agreements and N.J.S.A. § 34:1B-129, a significant portion of the tax credits would have been issued to the BEIP Debtors prior to termination of the Agreements by the NJEDA. The NJEDA cannot now use its own breach of the Agreements to its advantage by now taking the position that it does not have to pay the BEIP Debtors anything due to the BEIP Debtors' default. *See City of Trenton*, 2011 WL 3241579, at \*4 (explaining that, "A party in breach of contract cannot rely on the other party's

82337830;1

subsequent failure to perform to excuse its own prior breach."). As the Third Circuit has explained, "Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance <u>and sue for damages</u>." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992) (emphasis added). Indeed, "[a] material breach to a bilateral contract excuses the other party from performing its future obligations under that contract." *Weisman v. New Jersey Dep't of Hum. Servs.*, 982 F. Supp. 2d 386, 391 (D.N.J. 2013), *aff'd*, 593 F. App'x 147 (3d Cir. 2014). Indeed, it is black letter law set forth in the Restatement (Second) of Contracts that, "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237 (1981). Upon NJEDA's breach of the Agreements beginning in 2011, the BEIP Debtors' obligation to perform under the Agreements was discharged. Instead, the BEIP Debtors continued to perform under the Agreements by maintaining the required number of jobs in New Jersey and remitting millions of dollars of tax revenue to the State every year. And, as its right, it now sues for damages for NJEDA's breach of the Agreements. The NJEDA cannot now use the BEIP Debtors'

breach of the Agreements in 2021 to excuse its own prior breaches of the Agreements dating back to 2011.

In this case, the Plan Administrator's well-pleaded factual allegations in his proposed amended complaint do "plausibly give rise to an entitlement to relief" against the NJEDA for breach of the Agreements. To state a claim for breach of contract under New Jersey law, a claimant must allege: (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations. *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). Here, the NJEDA does not dispute that there were contracts with the BEIP Debtors. In the proposed amended complaint, the Plan Administrator alleged that NJEDA breached the Agreements by failing to issue the tax credits when due under the terms of the Agreements and as required by the applicable statute, N.J.S.A. § 34:1B-129. The Plan Administrator has alleged damages flowing from the NJEDA's breach of the Agreements. Finally, the Plan Administrator has plausibly alleged that the BEIP Debtors were in compliance with the Agreements until at least 2021, which is a majority of the Agreements' terms. Allowing the Plan Administrator to file the proposed amended complaint is not futile because he has stated a claim for breach of contract.

At the heart of this case are the facts that the NJEDA, for a period of now 16 years, failed to pay grants and then issue tax credits to which the BEIP Debtors are

38

entitled under the terms of the Agreements. Now that the BEIP Debtors are in bankruptcy and shut down all of their stores, resulting in not meeting the minimum number of jobs required by the Agreements for the most recent one or two years prior to the bankruptcy filing, the NJEDA wants to withhold all payments to which the BEIP Debtors were entitled going back to 2011. As detailed in the proposed amended complaint, the NJEDA acknowledged over the years in correspondence sent to the BEIP Debtors that tax credits owed under the Agreements had been certified by the New Jersey Division of Taxation, which is the last step in the process. (Adv. Doc. 41-1 at 7-12). The NJEDA *acknowledged in writing* that the BEIP Debtors were entitled to the tax credits but never issued them. (Adv. Doc. 41-1 at 156-185). Now, after failing to issue tax credits that the NJEDA acknowledged were due to the BEIP Debtors, the NJEDA wants to withhold all of the tax credits owed to the BEIP Debtors. This is despite the fact that under the terms of the Agreements, the BEIP Debtors would have been entitled to retain a majority of the tax credits, even if they subsequently defaulted because they were in compliance with the Agreements for a majority of the "Commitment Duration" of the Agreements. Such inequitable behavior of a state agency should not be tolerated by this Court and NJEDA should be required to adhere to the terms of its Agreements.

82337830;1

## B.    NJEDA Cannot Terminate the Agreements Because It Did Not Provide Notice to the BEIP Debtors

The NJEDA defaulted under the Agreements by not paying the amounts due thereunder when due and these defaults have continued through this day. The NJEDA now argues that it was entitled to terminate the Agreements because the BEIP Debtors failed to maintain sufficient jobs in New Jersey in 2021 and 2022. The NJEDA argues that because of its purported termination of the Agreements, all unpaid amounts which the NJEDA has defaulted on paying are now forgiven solely because the NJEDA had defaulted and not yet paid them.

Notwithstanding the fact that a termination of the Agreements would not affect the NJEDA's obligation to pay defaulted past due amounts to the BEIP Debtors, the NJEDA did not effectively terminate the Agreements because it did not give any prior notice of default for failure to maintain the minimum number of jobs to the BEIP Debtors.

The Agreements require that the NJEDA provide notice to the grant recipient of any "Event of Default" including the failure to maintain the required number of jobs. (Adv. Doc. 1-1 at 20; Adv. Doc. 1-2 at 13; Adv. Doc. 24-1 at 20-21). The language in paragraph 14 of the Agreements is clear and unambiguous: "Any one or more of the following shall constitute an event of default ("Event of Default") if the default is not cured within thirty (30) days *after written notice of the default* . . . ." The plain language of the Agreements clearly state that failure to maintain the

40

required number of jobs is a default only if the default is not cured within 30 days after written notice of the default. Likewise, paragraph 15 of the Agreements provide remedies upon an "Event of Default" only "***after having first given Grantee notice and opportunity to cure the default in accordance with Paragraph 14 hereof***." Because the NJEDA did not provide written notice to the BEIP Debtors of any default in the required number of jobs in 2021 and 2022, it cannot exercise the remedies provided in paragraph 15 of the Grant Agreements, including termination of the Agreements and withholding of payment of all grant payments not yet paid.

"[W]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." *In re Catanzareti*, 400 B.R. 145, 157 (Bankr. D.N.J. 2009), *aff'd*, No. CIV.A.09-2666GEB, 2009 WL 3424176 (D.N.J. Oct. 20, 2009) *quoting Sons of Thunder, Inc. v. Borden, Inc.*, 285 N.J. Super. 27, 666 A.2d 549, 559 (1995), *rev'd on other grounds*, 148 N.J. 396, 690 A.2d 575 (1997). Construction of a contract is not permitted when the language of the contract is plain and unambiguous. *D.R. by M.R. v. E. Brunswick Bd. of Educ.*, 838 F. Supp. 184, 190 (D.N.J. 1993). Contract terms are generally given their "plain and ordinary meaning." *Matter of Est. of Jones*, 477 N.J. Super. 203, 217, 305 A.3d 525, 533 (App. Div. 2023). If a court finds the terms of a contract are clear and unambiguous, there is no room for construction and the

court must enforce those terms as written. *C.L. v. Div. of Med. Assistance & Health Servs.*, 473 N.J. Super. 591, 284 A.3d 860 (App. Div. 2022).

In this case, the language of the Agreements is clear and unambiguous and must be enforced as written. Under paragraph 14 of the Agreements, an "Event of Default" under the Agreements occurs if, and only if, written notice is first provided to the grant recipient and the default is not cured within 30 days. Under paragraph 15 of the Agreements, the Agreements may only be terminated and unpaid grants forfeited if, and only if, notice was first given to the grant recipient under paragraph 14. The terms must be enforced by this Court as written. Because no notice of default for failure to maintain the minimum number of jobs was given by the NJEDA for 2021 and 2022, an "Event of Default" does not exist under the Agreements. Therefore, NJEDA may not terminate the Agreements and withhold payment of the grants already earned by the BEIP Debtors.

The NJEDA successfully argued to the Bankruptcy Court that no notice was required because the failure to maintain a certain number of jobs in 2021 and 2022 could not be cured in 2022 or thereafter. In other words, the giving of the required written notice would have been futile because the BEIP Debtors cannot go back in time and maintain jobs in New Jersey in 2021 and 2022 now. However, that is ***not*** what the clear and unambiguous language of the Agreements says. The NJEDA drafted the Agreements and specifically provided in them that no default occurs

42

unless written notice is first given to the grant recipient, ***including*** with respect to the failure to maintain the required number of jobs. While the NJEDA may be correct that the failure to maintain a certain number of jobs in a particular year cannot be cured in the following year, that is not what the NJEDA wrote in its contracts. The Agreements plainly and unambiguously require that written notice be provided to the BEIP Debtors for failure to maintain the required number of jobs before the Agreements can be called into default and terminated.

While the Bankruptcy Court correctly held that the NJEDA did not comply with paragraph 14 of the Agreements and did not give notice of default to the BEIP Debtors or Plan Administrator before terminating the Agreements, the Bankruptcy Court incorrectly held that there were no damages resulting from such breach. (Adv. Doc. 52 at 50). The Bankruptcy Court stated, "So, not because I'm saying it was futile to give notice of the breach and opportunity to cure, but because I don't see what the damages are if the notice was given. . . . [T]here are no damages resulting from the EDA's failure to give the 30-day opportunity to cure because if I gave them the opportunity to cure, they couldn't do it and they wouldn't be damaged." (Adv. Doc. 52 at 49). The Bankruptcy Court's analysis is clearly flawed because the BEIP Debtors are severely damaged – the Agreements have been terminated and the Plan Administrator's ability to recover up to $19 million of tax credits has been thwarted.

43

As indicated in the recent decision against the NJEDA in another case in which the NJEDA unjustly denied promised benefits, State agencies "'must 'turn square corners' rather than exploit litigational or bargaining advantages that might otherwise be available to private citizens.' The government must act fairly and 'adhere to strict standards in its contractual dealings' while also acting consistently with its 'supervening obligation . . . to deal scrupulously with the public.'" *Holtec Int'l v. New Jersey Econ. Dev. Auth.*, No. A-1477-21, 2023 WL 8264184, at \*5 (N.J. Super. Ct. App. Div. Nov. 30, 2023) (quoting *W.V. Pangborne & Co., Inc. v. N.J. Dep't of Transp.*, 116 N.J. 543, 561-562 (1989)). As a result, ambiguities of any kind in an agreement must be resolved in favor of the private citizen and against the State. "'An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. . . .'" *Nester v. O'Donnell*, 301 N.J. Super. 198, 210 (App. Div. 1997) (quoting *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 282 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993)). Whether a provision is ambiguous is a matter of law. *Schor v. FMS Fin. Corp.*, 357 N.J. Super. 185, 191 (App. Div. 2002). Where the government is a party to and the drafter of a contract, any ambiguity is "strictly construed against . . . the government entity." *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 171 N.J. 378, 398 (2002).

In this case, the NJEDA breached its Agreements with the BEIP Debtors beginning in 2011 by failing to pay grants and later failing to issue tax credits to

which the NJEDA itself said the BEIP Debtors were entitled. NJEDA then terminated the Agreements without providing the contractually required notice to the BEIP Debtors, in violation of the NJEDA's own Agreements. The Bankruptcy Court's holding that the BEIP Debtors have not been damaged as a result of the NJEDA's failure to give notice is patently wrong – the BEIP Debtors have lost out on up to $19 million of tax credits due to NJEDA's breach of the Agreements. Accordingly, the Bankruptcy Court's decision should be reversed by this Court.

## CONCLUSION

Appellant, Michael Goldberg, as Plan Administrator for 20230930-DK-Butterfly-1, Inc. respectfully requests that this Court reverse the decision of the Bankruptcy Court and find that leave to amend the complaint should have been granted.

Respectfully Submitted,

AKERMAN LLP

By: */s/ Steven R. Wirth*
Steven R. Wirth, Esq.
Email: steven.wirth@akerman.com
Raye C. Elliott (*pro hac vice* admission pending)
Email: raye.elliott@akerman.com
401 East Jackson Street, Suite 1700
Tampa, Florida 33602
Telephone: (813) 223-7333

and

Peter O. Larsen, Esq. (*pro hac vice* admission pending)
Email: peter.larsen@akerman.com
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
Telephone: (904) 798-3700
Facsimile:  (904) 798-3730

Counsel to the Plan Administrator

46

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this documents contains 11,341 words.

2.      This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*/s/ Steven R. Wirth*                          Date: July 25, 2025
Steven R. Wirth